## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION


**GENE M. VALENTINO,**

        **Plaintiff,**

**v.**                                    **Case No. 3:06cv504/MCR**


**MONICA BOND, individually, and in her capacity**
**as Senior Partner of the Bond Partnership;**
**THE BOND PARTNERSHIP n/d/b/a Bond Associates;**
**and**
**RICHARD L. ALBRIGHT, f/d/b/a The Richard Stephens Co., LTD.,**

        **Defendants.**

_____/

## ORDER GRANTING SUMMARY JUDGMENT

       In this diversity action plaintiff Gene M. Valentino ("Valentino" or "plaintiff") asserts claims arising in tort, contract, and Florida statutory law against defendant Monica Bond ("Bond") and the Bond Partnership (together, "the Bond defendants").[1]  On July 28, 2008, the court heard oral argument on the Bond defendants' pending motion for summary judgment.[2]  At issue in the motion is whether the laws of Florida or the laws of United Kingdom ("UK") apply to plaintiff's claims and whether, under the applicable law, the claims are time-barred.  As explained below,  the court concludes that Florida law governs this case and that no issues of fact exist as to whether under Fla. Stat. § 95.11 plaintiff's claims

---

    [1]  The third defendant, Richard L. Albright ("Albright"), has not appeared.  He apparently cannot be located and has not been served.

    [2]  Plaintiff filed a response in opposition to the motion to which, with the court's permission, the Bond defendants replied.

are untimely.  The court further finds that even if the law of the UK applied there are no jury questions regarding whether plaintiff's claims are barred under the Limitation Act of 1980 (Eng.), §§ 2, 32.  For these reasons, the court GRANTS the Bond defendants' motion for summary judgment.

**BACKGROUND**

The following facts are recited in the light most favorable to plaintiff as the nonmovant or, except as noted, are undisputed.[3]

During 1998 and early 1999, Albright and others associated with a firm known as Continental Asset Management Corporation ("CAMC") contacted Valentino in Florida and encouraged him to invest funds with CAMC, a Delaware-incorporated firm with an office in London, England.[4]  Valentino was informed that the money he placed in CAMC's foreign investment program would be held in an escrow account maintained by Bond, who was identified as a chartered accountant located in London.  Valentino testified that the investment program involved short-term loans to governments of third-world countries which were otherwise unable to borrow money on the world financial market.  He also testified that he knew the promised ultra high-yield of 30% per month was due to the extremely high degree of risk involved in this investment.  According to Valentino,  he – from a location in Florida, and Bond – from a location in England, engaged in a telephone conversation sometime prior to February 15, 1999.  Valentino maintains that during the call Bond promised that his investment funds would be covered by a Lloyd's of London professional indemnity and fidelity insurance policy and that the funds would be properly secured before they were released from her company's escrow account.   The Bond

---

[3]  At summary judgment this court must view the facts in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. See Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

[4]  Eugene McDowell ("McDowell") was the president of CAMC. Shreyas Shah ("Shah") was the corporation's vice president.  Both men allegedly participated in many of the described events but neither is named as a defendant in this case.

defendants deny this conversation took place, much less that Bond made any such promises to Valentino.

On February 15, 1999, by facsimile transmission, Bond sent Valentino a copy of her curriculum vitae that, among other things, outlined her extensive expertise in forensic and investigative accounting.  Also on February 15, 1999, Valentino signed an agreement with CAMC; Bond was not a party to this contract.  Under the agreement, which among other provisions contained several confidentiality requirements, Valentino agreed to invest $750,000 with the firm, with the funds to be transferred initially to an escrow account maintained by Bond.  On February 18, 1999, apparently with the assistance of his attorney, Valentino authorized his bank in Pensacola, Florida, to release $750,000 to Bond's escrow account in London via wire transfer and on February 19, 1999, the transfer was completed. Valentino spoke with Bond again on March 23, 1999, during which call he alleges she reaffirmed her prior representations to him regarding obtaining a bond to protect his funds and not releasing the money from the escrow account until it was appropriately secured. This was the last contact Valentino had with Bond.

On April 14, 1999, Bond transferred Valentino's $750,000 from the escrow account to Ruparelia Thaker, a firm of solicitors in England.  Valentino was unaware of the transfer at the time.  He was also unaware that no valid bond had been obtained or was in place, although he had previously reviewed and approved language for the anticipated document.[5]  Also without Valentino's knowledge or returning to Valentino the $16,000 in interest remaining in his account, Bond closed all of her client accounts in June 1999.  In

---

[5] In his complaint Valentino alleges that in May 1999 McDowell and Albright provided him with what they represented as documentation of the required fidelity bond.  In his affidavit, however, Valentino states only that on May 13, 1999, Shah sent him a copy of a letter from the Ruparelia Thaker firm confirming it had seen the text of the performance bond and bank guarantee.

   Also with respect to the indemnity bond, Valentino points to a letter from Shah to Bond dated April 12, 1999, that refers to a policy issued by First City Insurance Brokers; according to Shah's letter, the "client" had accepted the language contained in the indemnity policy. (Doc. 8-2, Exh. H).  Shah's letter also says that a clearer copy of the agreement would be sent directly to Bond from the contracting party, Equity Financial Services, Ltd., and that other documents pertinent to the transaction were attached to the letter.  Bond produced the Shah letter during discovery but denies having copies of any of the documents referenced by Shah or any recollection of ever having received them.

early June 1999 McDowell and Shah made two payments totaling $68,000 to Valentino from their own funds, allegedly to show their good faith and the viability of the type of trading program in which Valentino had invested but which was not yet operative.   On September 29, 1999, Valentino signed an amended investment agreement with CAMC which states, inter alia, that the first payment based on a monthly yield of no less than 30% would be made to Valentino on October 29, 1999, with subsequent payments due every thirty days thereafter; the parties also agreed that CAMC would provide Valentino with a copy of the indemnity or surety bond.

On November 27, 1999, Valentino received a facsimile message from CAMC stating that McDowell had filed a claim with the Solicitors Indemnity Fund Claims Office in London demanding the immediate return of the funds held by the Ruparelia Thaker firm.  According to Valentino, this message was his first notice that there was a problem with his investment money being released by the Ruparelia Thaker firm for CAMC's trade program.[6] Sometime prior to December 19, 1999, Valentino spoke with McDowell by telephone and told McDowell he had never received copies of the executed security bond or bank guarantee. Valentino asked McDowell about making a claim based on those documents given the difficulties they were experiencing with the Ruparelia Thaker firm.   A few days later McDowell, by facsimile, forwarded copies of documents to Valentino that indicated CAMC had made a claim to the Solicitors Indemnity Fund, which had assigned the case to a London law firm to conduct an investigation. McDowell also provided documents to Valentino that showed McDowell had, at the investigating law firm's recommendation, contacted the police in Leicestershire, where Ruparelia Thaker was located, about obtaining a refund of the investment funds.  McDowell advised in an accompanying letter to Valentino that the reason he had not gone to law enforcement authorities first was that

---

[6] Valentino asserts he did not learn that Bond had closed her company's accounts in June 1999 until she so stated in a declaration made in this case.  According to Valentino, had he been advised of the closing of the accounts – even though Bond had agreed to hold the bank guarantee for the duration of Valentino's participation in the trading program – he would have been alerted at that time to a possible breach of duty by the Bond defendants.  At the latest, he contends, this information – taken with the information reported by McDowell that the funds transferred to the Ruparelia Thaker firm were missing – would have alerted him to the seriousness of the problem some time in November of 1999.

that "the insurance would not touch the case until the police did their work. This way the bond/insurance will pick up the payment then chase the Escrow/Lawyers/Traders, but we will [have] been paid by the time the police finish their wor[k]."[7]   According to Valentino, in light of these representations he did not insist on taking action to recover under the bond or bank guarantee at that time.   In his letter to Valentino, McDowell also made reference to documents being prepared by his attorney pursuant to which CAMC would make a separate guarantee of payment to Valentino for his investment funds, with a total indebtedness of $1,200,000 payable to Valentino by March 15, 2000.   According to Valentino, McDowell implored Valentino not to pursue a claim against the Lloyd's of London indemnity bond or the bank guarantee until the Solicitors Indemnity Fund and criminal investigators advised that pursuing such claims would not impair their investigations.   McDowell also indicated that both he and Shah would be harmed financially if Valentino sought payment under the indemnity bond and bank guarantee as they had used their personal funds to obtain these securities.

McDowell and Valentino communicated numerous times through November 2000. During this time McDowell provided Valentino with additional information about the investigations into the investment funds as well as various trading programs McDowell purportedly was participating in as part of his on-going efforts to pay Valentino the $1,200,000 due under their agreement.   Based on this correspondence, McDowell continued, successfully, to convince Valentino not to attempt any independent investigation or inquiries or to seek to make a claim under the indemnity bond or bank guarantee. On November 15, 2000, Scotland Yard and FBI investigators interviewed Valentino in Pensacola, Florida, regarding the CAMC investment scheme; Valentino was given little information but was led to believe he was considered a potential target of the investigation, not a victim.   Later, however, the investigators determined that Valentino was not implicated and asked him to cooperate in the prosecution of various persons involved in the fraudulent investment scheme, which he did.   According to Valentino, he was asked

---

[7]  Doc. 82, Plaintiff's Exh. J.  See also Exhs. K-N.

by Scotland Yard and the FBI not to reveal to McDowell, Shah, or others information about the ongoing investigation.  Valentino also maintains that the law enforcement entities further recommended that Valentino not pursue his civil claims until the criminal investigation was concluded because doing so could jeopardize the criminal prosecutions.[8] Valentino complied with these requests.

Valentino gave a witness statement to authorities in December 2000.  According to Valentino, at the time he believed that Bond and the Bond Partnership were not implicated in the theft of his $750,000.  It was not until sometime in early 2001 that he discovered that the Lloyd's of London bond and bank guarantee documents, which Valentino believed had been in place and were valid, in fact were invalid.  Upon making that discovery Valentino assumed that someone had impersonated Bond in February and March 1999 in connection with the transfer of his investment funds. Valentino claims that only in late 2001 did he learn that Bond in fact was the person involved.  Valentino traveled to London in 2003 to give testimony in the criminal prosecution of UK accountant Jas Mudhar ("Mudhar") and others who were involved in the fraudulent investment scheme  through which Valentino's money had been stolen.[9]  Valentino learned for the first time that the bond and guarantee were in fact forgeries that had been produced by Mudhar.  Mudhar and other defendants in the criminal case were found guilty of operating a fraudulent investment scheme.  None of the investment money, including Valentino's, was ever recovered.

On July 26, 2001, Valentino initiated suit against CAMC and McDowell in this

---

[8]  McDowell provided Valentino with a faxed copy of a letter from the Leicestershire Constabulary, apparently dated October 12, 2000, which advises that complaints about the Ruparelia Thaker firm had been referred to Scotland Yard's Serious Fraud Office in London for further investigation. Counsel for Valentino suggested at oral argument that this letter advised McDowell not to pursue a claim against the bond until the investigation had concluded.  The letter contains no such statement.  In Valentino's affidavit, however, he indicates that Scotland Yard and FBI authorities asked him not pursue his claims until the investigation was closed and the formal prosecutions underway.  Valentino does not identify the date when this request was made but presumably it occurred sometime after November 2000, when officials from these agencies first contacted him.

[9]  Valentino points to Bond's statement that she was introduced to Shah by Mudhar, whom she described as an acquaintance of hers.  Valentino does not identify any other evidence that links Bond to the defendants who were successfully prosecuted in the criminal case in which he testified.

district.  See Case No. 3:01cv306 ("the CAMC suit").  Valentino's amended complaint in that case, filed October 15, 2001, alleges, inter alia, that CAMC arranged to have his funds transferred to a solicitor's law firm in London; that Valentino's $750,000 investment funds, which were part of a pool of investments totaling $3,000,000, had disappeared; and that the promised security for Valentino's investment funds had never been obtained.  The record reflects a judgment of default was entered on December 7, 2001, against the defendants in the amount of $1,200,000.  On November 13, 2006, Valentino brought the instant case against the Bond defendants and Albright.  The complaint contains the following state law claims against the Bond defendants: (I) negligence; (II) negligent misrepresentation; (III) breach of fiduciary duty; (IV) fraudulent misrepresentation;

(V) breach of contract; and (VI) misleading advertising, in violation of Fla. Stat § 817.41. In Count VII plaintiff also asserts a claim of fraudulent misrepresentation against Albright.

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A factual dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." Anderson, 477 U.S. at 248; Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).  Nevertheless, a general denial unaccompanied by any evidentiary support will

not suffice. <u>See</u>, <u>e.g.</u>, <u>Courson v. McMillian</u>, 939 F.2d 1479 (11th Cir. 1991); <u>Hutton v. Strickland</u>, 919 F.2d 1531 (11th Cir. 1991).  Furthermore, the court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. <u>See</u> <u>Anderson</u>, 477 U.S. at 249. Indeed, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." <u>Anderson</u>, 477 U.S. at 252.  The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).

**DISCUSSION**

This district court sitting in diversity must apply the conflict-of-law rules of Florida, its forum state, to determine whether the laws of Florida or of the UK (applicable to England) should apply to Valentino's causes of action.  <u>See</u> <u>Grupo Televisa, S.A. v. Telemundo Comm. Group, Inc.</u>, 485 F.3d 1233, 1240 (11th Cir. 2007);  <u>Judge v. American Motors Corp.</u>, 908 F.2d 1565, 1567 (11th Cir. 1990) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); <u>Garcia v. Public Health Trust of Dade County</u>, 841 F.2d 1062, 1064 (11th Cir. 1988) (stating that in conflict-of-laws inquiry, court must first determine whether the specific issue at hand [is] a problem of law of contracts, torts, property, etc."; second, the court must "determine what choice of law rule the state . . . applies to that type of legal issue"; and third, the court must "apply the proper choice of law rule to the instant facts and thereby conclude which [jurisdiction's] substantive law applies.") (quoting <u>Acme Circus Operating Co., Inc. v. Kuperstock</u>, 711

F.2d 1538, 1540 (11th Cir.1983)).  Florida applies the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws ("the Restatement") to resolve most conflict-of-laws questions, including questions concerning statutes of limitations in tort cases.  See Grupo Televisa, S.A., 485 F.3d at 1240 (citing Bishop v. Florida Specialty Paint Co., 389 So.2d 999, 1001 (Fla. 1980)).  The Eleventh Circuit has made it clear that federal courts should follow the comments of the Restatement when making a Florida choice-of-law determination.  See Grupo Televisa, S.A., 485 F.3d at 1241-43 (criticizing district court for "largely ignor[ing]" guidance contained in the Restatement's comments).

For the following reasons, applying Florida's choice-of-laws rules the court concludes that Florida law – rather than UK law – governs this cause of action and that, under Florida law, plaintiff's claims are time-barred.  Alternatively, the court concludes that even if UK law were applied Valentino's claims are untimely.

### Tort Claims (Counts I through IV)

Citing Merkle v. Robinson, 737 So.2d 540, 542-43 (Fla. 1999), Valentino evidently takes the position that under the first inquiry described in Garcia (i.e., identifying "whether the specific issue at hand [is] a problem of law of contracts, torts, property, etc.") the defendants have mischaracterized the present issue in this case as a tort conflict-of-laws question rather than a statute of limitations question.  See Garcia, 841 F.2d at 1064.  Valentino also apparently maintains that if the question is properly treated as a statute of limitations problem, under the second Garcia inquiry (i.e., determining which choice of law rule should be applied to that type of legal issue), Merkle requires this court to apply § 145 of the Restatement to the four tort claims naming the Bond defendants to determine whether the claims are time-barred. The defendants respond that Valentino misreads Merkle and that the issue presented in fact should be treated as a tort question.  Moreover, they argue, under Florida law statute of limitations questions receive the same treatment as substantive choice-of-law questions; thus the issues presented here are properly analyzed under two different sections of the Restatement.  The defendants agree that the general tort principles outlined in § 145 are applicable to Valentino's negligence claim but maintain that the particular types of legal issues involved in the remaining three tort claims

should be analyzed under the more specific principles applicable to fraud and misrepresentation claims that are discussed in § 148 of the Restatement.[10]

The court's understanding of <u>Merkle</u> is more aligned with the Bond defendants' interpretation of the case than Valentino's.  As the court reads the decision, in making its choice-of-law determination the Supreme Court of Florida identified "the issue at hand" as a tort problem – not a statute of limitations problem – then proceeded to apply the more general provisions of § 145 to the type of tort presented, a negligence claim for medical

---

[10] Section 145, entitled The General Principle, provides:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
    (a) the place where the injury occurred,
    (b) the place where the conduct causing the injury occurred,
    (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
    (d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 148, Fraud and Misrepresentation, provides:
(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
    (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
    (b) the place where the plaintiff received the representations,
    (c) the place where the defendant made the representations,
    (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
    (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
    (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.
Restatement (Second) of Conflict of Laws §§ 145, 148.

malpractice, in determining whether the claim was barred by the state's statute of limitations.  Fraud and misrepresentation were not at issue and thus § 148 was not implicated or addressed.  See Merkle, 737 So.2d at 542) (citing Bishop, 389 So.2d at 1001) (emphasis added).  Moreover, as defendants submit, the Merkle court made it clear that in Florida "statute of limitations questions [are treated] the same as 'substantive' choice of law questions . . . ." (citing Bishop, 389 So.2d at 1001)).  Based on its reading of the Merkle case, this court concludes that because neither the tort alleged in Count I (negligence) nor the tort alleged in Count III (breach of fiduciary duty) falls within any of the "special rules" discussed in §§ 146-55, both should be analyzed under the generally applicable methodology of § 145.  See Comment a of § 145 (noting that § 145 is "cast in terms of great generality" due to the "great variety of torts and of issues in tort . . ." and that §§ 146-55 deal "with particular torts as to which it is possible to state rules of greater precision."); Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996) (applying § 145 to breach of fiduciary duty claim).  The two remaining counts applicable to the Bond defendants, Count II (negligent misrepresentation) and Count IV (fraudulent misrepresentation), should be analyzed under the more specific § 148, which pertains to claims involving fraud and misrepresentation. See id., 92 F.3d at 1115 (noting that under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration) (citing Department of Corrections v. McGhee, 653 So.2d 1091, 1092-93 (Fla.Dist.Ct.App. 1995)).

      Counts I and III: Negligence and Breach of Fiduciary Duty

      The "'General [Tort] Principle' in section 145 [ ] is intended to inform courts as they apply the more specific 'Choice of Law Principles' outlined in section 6.[11]  The more specific 'Choice of Law Principles' apply to all areas of law which determine choice of law

---

[11] Section 6 lists the following factors as important choice-of-law considerations: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2).

through a most significant relationship test, not just to issues of tort." <u>Grupo Televisa, S.A.</u>, 485 F.3d at 1240.  As noted, contacts to be taken into consideration under § 145 when applying the principles of § 6 include (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.[12]  <u>Bishop</u>, 389 So.2d at 1001 (quoting Restatement (Second) of Conflict of Laws). The Restatement also cautions that "these contacts are to be evaluated according to their relative importance with respect to the particular issue." <u>Id.</u>  The purpose of the test is not to find the sovereign with the most contacts; rather, the analysis is done to determine which jurisdiction has the most "significant" contacts. <u>Judge</u>, 908 F.2d at 1569.

 Factor (c) of § 145 is effectively neutral and thus does little to inform the court's

---

[12]  Comment e to § 145 in part provides:

*The place where injury occurred.* In the case of personal injuries or injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law. [ ] This contact likewise plays an important role in the selection of the state of the applicable law in the case of other kinds of torts, provided that the injury occurred in a single, clearly ascertainable, state. . . . Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law.  This will be so, for example, when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the partes with respect to the particular issue. [ ] This will also be so when, such as in the case of fraud and misrepresentation (see § 148), there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . .

*The place where conduct occurred.* When the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort. This is particularly likely to be so with respect to issues involving standards of conduct, since the state of conduct and injury will have a natural concern in the determination of such issues.

Choice of the applicable law becomes more difficult  . .. where the defendant's conduct and the resulting injury occurred in different states. When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law . . . . [W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance . . . .

decisionmaking.  Valentino is a Florida resident while the Bond defendants are residents of the UK.  Factors (a), (b), and (d) are, however, relevant to the instant analysis.  As to factor (d), the parties communicated verbally and in writing across the Atlantic Ocean; thus it may be said that their relationship was centered in both Florida and the UK.  While this factor therefore may also be somewhat neutral in effect, because Florida is where the relationship between the parties was created the court concludes it weighs slightly in favor of applying the laws of Florida.  See Trumpet Vine Investments, N.V., 92 F.3d at 1116.  As to factor (a), defendants argue that Florida is where the economic injury alleged by Valentino occurred because it is where he sustained and felt the impact of the loss of the transferred funds.  The court agrees.  See Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002).  Nevertheless, that conclusion is not determinative of the weight this factor should be accorded. Although "[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law," Bishop, 389 So.2d at 1001, the court notes that in other circumstances "the state where the injury occurred may have little actual significance for the cause of action." Id. Indeed, it is only for "injuries to tangible things" that "the place where the injury occurred is the contact that, as to most issues, plays an important role in the selection of the applicable law." Restatement, § 145, cmt. e.  When the injury is purely financial, as is alleged in this case, factor (a) loses some of its significance.  Accordingly, while the place of injury favors applying Florida law in this case, because Valentino alleges solely economic injury the factor is not due dispositive weight.

In Grupo Televisa, S.A., the Eleventh Circuit discussed factor (b), which pertains to the place where the conduct causing injury took place.  The court concluded that in a misappropriation of trade values claim the principal location of the defendant's conduct was the single most important contact.  Grupo Televisa, S.A., 485 F.3d at 1241; see Restatement, § 145, cmt. f ("the place of injury is of particular importance in the case of personal injuries and of injuries to tangible things. . . . [T]he place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts.  Instead, the

principal location of the defendant's conduct is the contact that will usually be given the greatest weight . . . ."). In this case, Valentino's negligence and breach of fiduciary duty claims, both of which implicate economic injury only, are more akin to a false advertising claim than a personal injury or injury to tangible property claim. See Trumpet Vine Investments, N.V., 92 F.3d at 1116. Thus the place of the defendant's conduct is an important consideration in this choice-of-laws analysis. Valentino alleges, and for the purpose of this discussion the court accepts as true, that Bond failed to conduct any meaningful due diligence before recommending that Valentino invest in CAMC; Valentino also alleges that Bond made certain inaccurate representations in order to solicit his business during two telephone calls made to him in Florida. Largely on the basis of the two conversations plaintiff successfully argued that the court could exercise personal jurisdiction over the Bond defendants because the minimum contacts requirement was satisfied. These conversations are also important for purposes of the court's conflict-of-laws "most significant relationship" analysis, but only to a lesser degree. Of greater "qualitative" significance to Valentino's negligence and breach of fiduciary duty claims is the allegation – which the court also accepts as true here – that the Bond defendants transferred Valentino's funds to the Ruparelia Thaker firm without first obtaining the promised security. In light of the greater significance of this conduct (which occurred in the UK) to the claims at issue the court concludes factor (b) is entitled to great weight. And factor (b) points to application of the laws of the UK.

The above determinations, while instructive, are not conclusive and do not end the court's inquiry. The court must next consider these contacts in connection with the policy considerations outlined in § 6.[13] So doing, the court is persuaded that Florida is the state with the most significant relationship to the occurrences and parties involved in this case.

As an initial matter, subsection (d) of § 6 [concerning the protection of justified expectations] and subsection (f) [concerning the certainty, predictability and uniformity of

---

[13] The Bond defendants do not address the § 6 policy considerations either in their motion or their reply.

result] have little bearing on the choice-of-law analysis in tort claims such as those set out in Counts I and III.  See Nelson v. Freightliner, LLC, 154 Fed.Appx. 98, 104 (11th Cir. 2005); Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc., 2008 WL 1775409, * 16 (S.D.Fla. 2008).  Because of the lesser significance of factors (d) and (f), the remaining five factors assume greater importance. Id.  To balance the competing interests of Florida and the UK, the court must state the particular rule of law to be applied by each interested forum, identify the purposes or policies underlying each forum's rule, and assess the degree to which the purposes underlying each rule would be furthered by the rule's application.  Piamba Cortes v. American Airlines, Inc., 177 F.3d 1272, 1299 (11th Cir. 1999).  In this case, as noted, the rule of law to be applied in Florida is Fla. Stat. § 95.11 and in the UK it is the Limitation Act of 1980 (Eng.).  In The Cadle Co. v. Hearley [2001] 1 Lloyd's Rep. 143, 152 (Oct. 26, 2001), the court stated that "[t]he public policy of the Limitation Act, 1980 is, no more and no less, the prevention of stale claims from being litigated." Id.  The public policy behind § 95.11 is virtually identical.  As noted in Major League Baseball v. Morsani, 790 So.2d 1071, 1078 (Fla. 2001), "a main purpose of the statute of limitations is to protect defendants from unfair surprise and stale claims." Valentino submits that Florida also has a strong policy in favor of providing litigants, especially its own residents, with a forum to seek redress for wrongs and preventing defendants from profiting from their own misconduct.  According to Valentino, these policies weigh heavily towards applying the UK's limitations law because under Florida law his claims would be barred while under the UK's law, if concealment of the wrongs is established, his claims may proceed.  The court acknowledges the policy concerns expressed by Valentino.  As stated, however, a primary purpose of both Florida's and the UK's statute of limitations is to prevent the litigation of stale claims.  In the court's view, this purpose – which is common and central to both statutes – is best served by applying the rule of the forum that would preclude the prosecution of claims that were not filed until some seven years after the critical events giving rise to them took place.  That forum is Florida.  The remaining factors in § 6 also favor the application of Florida law. Florida is the state in which this district court sits. The determination and application of Florida law is,

therefore, easier than the determination and application of UK law.  Also, the application of Florida law does not offend the needs of the international system.  In short, taking into consideration the relevant § 145 factors when applying the principles identified in § 6, the court concludes that Florida law should govern Counts I and III.

The court further finds that no genuine issues of material fact exist with respect to whether Counts I and III are barred under Florida law.  Valentino in fact concedes as much. The court nevertheless recites the following pertinent facts and conclusions of law for the record.

On July 26, 2001, Valentino filed the CAMC suit seeking return of $750,000 that he had transferred to the escrow account maintained by Bond.  On October 15, 2001, Valentino served an amended complaint in that case alleging that the Lloyd's of London security bond that had been promised to him was never obtained.  The amended complaint further alleges that CAMC and McDowell arranged to have his funds transferred to a solicitor's law firm and that the entire $750,000 he transferred initially to Bond's escrow account had disappeared.  Valentino filed this suit against the Bond defendants and Albright on November 13, 2006.

With respect to Count I, under Florida law the statute of limitations for negligence causes of action is four years. § 95.11(3)(a).  Additionally, Florida law provides that a cause of action for negligence accrues "when the last element constituting the cause of action occurs." § 95.031(1).  In negligence actions a cause of action is deemed to have accrued when the plaintiff discovers, or should have discovered, the act constituting an invasion of his legal rights.  Here, it is undisputed that Valentino had actual knowledge of the alleged violation of his rights no later than October 2001, when he filed his amended complaint against CAMC and McDowell.  As the events described in the amended complaint occurred more than four years before suit was filed in this case in November 2006, no genuine issue of fact exists regarding whether Valentino's claim for negligence is time-barred.

The same result ensues with respect to Count III, Valentino's claim for breach of fiduciary duty.  Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are:

the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002) (citations omitted). The statutory period for filing such claims is four years. See Fla. Stat. § 95.11(3)(o)(p) (providing limitations periods for intentional torts and actions not specifically addressed); see also Berg v. Wagner, 935 So.2d 100, 102 (Fla. 4th DCA 2006). The statute of limitations begins to run when the cause of action accrues, which is "when the last element constituting the cause of action occurs." See Fla. Stat. § 95.031(1); Davis v. Monahan, 832 So.2d 708, 709 (Fla. 2002). In this case, the alleged breach and resulting damages occurred in April 1999, when the Bond defendants released Valentino's funds to the Ruparelia Thaker law firm without a valid bond in place. No genuine factual issues exist regarding whether Valentino either knew or should have known of this event by July 2001 (when he initially filed the CAMC suit) or, at the latest, in October 2001 (when he filed his amended complaint). As a matter of law, Valentino's breach of fiduciary duty claim filed in November 2006 therefore is precluded under § 95.11(3)(o)(p).

Counts II and IV: Negligent Misrepresentation and Fraudulent Misrepresentation

Section 148 specifically addresses torts involving fraud or misrepresentation. See § 148 cmt. a (stating "[t]he rule of this Section applies to actions brought to recover pecuniary damages suffered on account of false representations, whether fraudulent, negligent or innocent."). As noted, under § 148 courts are instructed to apply a six-part balancing test "[w]hen the Plaintiff's action and reliance took place in whole or in part in a state other than that where the false representations were made." Restatement (Second) of Conflicts of Laws, § 148 (1971). This test focuses on (a) the place or places where the plaintiff acted in reliance upon the defendant's representations; (b) the place where the plaintiff received the representations; (c) the place where the defendant made the representations; (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representation of the defendant. According to comment j of § 148, "[i]f any two

of the above-mentioned contacts, apart from the Defendant's domicile, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." Restatement (Second) of Conflicts of Laws, § 148, comment j.  Nevertheless, the court again notes the Eleventh Circuit's instruction that it is the jurisdiction that has the most significant contacts rather than the greatest number of contacts whose laws should be applied. Judge, 908 F.2d at 1569.

Factor (d),  the domicile of the parties, and factor (e), the location of the tangible thing, have little bearing on the instant analysis.  Factor (c), the place where the defendant made the representations, favors the application of UK law.  Three other factors, however, reflect significant contacts that were based exclusively in Florida and thus persuasively point to the application of Florida law.  As to factor (a), the place where the plaintiff acted in reliance upon the defendant's representations, it is undisputed that Valentino was in Florida at the time he agreed to transfer $750,000 by wire from Florida to the Bond defendants' escrow account in the UK and in fact released the funds.  It is also undisputed that, with respect to factor (b), Valentino received the alleged misrepresentations while in Florida during two telephone conversations.  Finally, with respect to factor (f), there can be no question that Valentino was to render performance of the oral agreement in Florida and did so by transferring his funds from Florida to the UK.

The court next must consider these contacts in connection with the policy considerations outlined in § 6.  For essentially the same reasons discussed above in connection with the § 145 factors, the court finds that Florida is the state with the most significant relationship to the occurrences and parties involved in this case.

Valentino also concedes that no genuine issues of material fact exist with respect to whether Counts II and IV are time-barred under Florida law.  Again, the court agrees. Under Florida law, negligent misrepresentation is not treated as a claim in negligence but rather as a form of fraud. Allocco v. City of Coral Cables, 221 F.Supp. 1317,  1359 n. 17 (S.D.Fla. 2002) (citing Watson v. Jones, 25 So. 678, 683 (Fla. 1899), and Burton v. Linotype Co., 556 So.2d 1126, 1129 (Fla. 3d DCA 1989)).  Just as with claims founded on

fraud, Florida law provides a limitations period of four years for negligent misrepresentation claims. § 95.11(3) (j), Fla. Stat.  Additionally, a cause of action for fraud accrues at "the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." § 95.031(2)(a), Fla. Stat.  In this case, Valentino's allegations regarding the representations made by the Bond defendants to induce him to enter into the oral agreement occurred in February 1999.[14]  At the latest, Valentino had actual notice of the facts giving rise to his allegations of fraud by October 2001, when he filed his amended complaint in the CAMC action and raised the same allegations against the defendants in that case that he has raised against the Bond defendants.  Thus, no genuine factual issues exist for trial as to whether Valentino's claim for negligent misrepresentation is time-barred.

Valentino's claim for fraudulent misrepresentation is likewise precluded.  The allegations involved in this claim are similar to those made in connection with the negligent misrepresentation claim.  "The elements of a negligent misrepresentation claim are essentially the same as those for fraudulent misrepresentation, except that, instead of knowledge of the falsity of the representation, the plaintiff need only prove that the representor reasonably should have known of the statement's falsity." Rogers v. Cisco Sys., 268 F.Supp.2d 1305, 1312 (N.D.Fla. 2003).  As the same legal and factual analysis effectively apply to both of Valentino's claims, this cause of action is also barred by the four year statute of limitations.[15]

---

[14] The evidence, taken the light most favorable to Valentino, reflects that Bond and Valentino spoke again in March 1999 regarding the transfer of Valentino's funds.  According to this evidence, however, during this contact the parties merely reiterated the terms of the existing agreement.  In other words, no new agreement was made nor were the terms of the agreement reached in February 1999 altered during the March 1999 conversation.

[15] In Count VII Valentino asserts a claim of fraudulent misrepresentation against Albright as to whom, it was previously noted, there is no record of service having been effected.  Prior to dismissing this defendant the court should give Valentino notice and the opportunity to show good cause for this failure.  Alternatively, because the foregoing analysis with respect to Count IV also applies to Count VII, with notice to Valentino the complaint could also be dismissed as to Albright.  As a matter of expedience, at this time the court will proceed with the former choice and will direct the dismissal of Albright, without prejudice, with the notice afforded to Valentino consisting of the instant order. If within ten days Valentino files a response showing good cause for the failure to timely effect service on Albright, the court may reconsider Albright's dismissal.

**Contract Claim (Count V)**

Although the "most substantial relationship" test is applied in Florida to most conflict-of-laws questions in tort cases, for contract claims Florida adheres to the rule of lex loci contractus; the rule provides that the contract is governed by the law of the place where the contract was executed. American United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1059 (11th Cir. 2007); State Farm Mut. Auto. Ins. Co. v. Roach, 945 So.2d 1160, 1162-1163 (Fla. 2006). Determining where a contract was executed is a fact-intensive inquiry and requires assessing where the final act necessary to complete the contract was effected. Prime Ins. Syndiate, Inc. v. B.J. Handley Trucking, Inc., 363 F3d 1089, 1092-93 (11th Cir. 2004). "The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." Id. (citing Buell v. State, 704 So.2d 552, 555 (Fla.Dist.Ct.App. 1997)).

In this case, the complaint alleges that Valentino agreed to send the Bond defendants $750,000 for them "to accept, hold, and manage" with the understanding the firm would "have in place certain security for full replacement of plaintiff's funds."  The evidence, undisputed for the purpose of the instant motion, is that the terms of the parties' oral contract were established during a telephone call Valentino received in Florida some time prior to February 15, 1999, during which Bond promised to maintain Valentino's funds in her escrow account until they were secured with an indemnity bond.  Valentino communicated his acceptance of the terms of the agreement by transferring the funds from his account in Florida to Bond's escrow account in the UK on February 18, 1999. Valentino's act was the final one necessary to complete the contract, and it occurred in Florida.  Accordingly, Florida law governs the breach of contract claim.

Valentino wisely concedes this claim too is barred under Florida law.  As it is undisputed that no written contract between the parties existed, the applicable statute of limitations for Valentino's breach of contract claim is four years under Florida law. See § 95.11(3)(k), Fla. Stat.  A cause of action for breach of contract accrues under Florida law when the last act constituting the breach occurs.  Calhoun v. Greyhound Lines, Inc., 265 So.2d 18, 21 (Fla. 1972).  In this case, a breach, if any, occurred when the Bond

defendants transferred Valentino's money to the Ruparelia Thaker law firm in April 1999 without valid security.  That event predated the filing of this complaint by more than seven years.  Even though Valentino may not have been aware of the transfer or the lack of a valid security bond until a date after April 1999, he was certainly aware of these facts no later than October 2001, when he filed his amended complaint in the CAMC case.  Therefore, no jury question exists with respect to whether Valentino's claim for breach of contract is time-barred.

### Misleading Advertising in Violation of Florida Law (Count VI)

Valentino also asserts a claim of misleading advertising against the Bond defendants under § 817.41, Fla. Stat., based on his allegation that the curriculum vitae Bond sent to him in February 1999 contained false information. Valentino now concedes the claim is barred.  Again, the court notes its agreement with this conclusion.  Florida law clearly applies to this claim. Furthermore, because a cause of action for violating a Florida statute must be brought within four years of the date the cause of action accrues, see § 95.11(3)(n), the claim had to have been brought by February 2003.  This claim was not filed until November 2006 and thus it too is time-barred.

### Analysis under UK law

As discussed, the court concludes that Florida law applies to time-bar Valentino's claims.  In the alternative, even if the law of the UK applied the court is satisfied that no genuine issues of material fact exist that would preclude granting defendants' motion for summary judgment on statute of limitations grounds.

As an initial matter, the parties agree that under UK law the limitations period for all of Valentino's contract and tort claims is six years. Northern Trust Co. v. Peters, 69 F.3d 123, 130 (7th Cir. 1995) (noting that under UK law claims sounding in tort and contract have a six-year limitations period). Thus if Valentino could establish that his claims arose on or after November 13, 2000, under the law of the UK they would be timely filed, since the complaint in this case was initiated November 13, 2006.  As the foregoing discussion reflects, however, the relevant events largely took place prior to November 13, 2000. Thus, absent an enlargement of the limitations period, Valentino's claims are time-barred

under UK law.

Valentino correctly points out that in some circumstances UK law permits extending the statutory period for filing claims.  As noted in <u>Northern Trust Co.</u>, "[u]nder U.K. law, where either the plaintiff's claim for relief is predicated upon the defendant's fraud or the defendant has concealed a fact relevant to the plaintiff's claim for relief, 'the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.'" <u>Id.</u> at 130 (citing Limitation Act 1980, § 32, and <u>Gray v. T.P. Bennett & Son</u>, [1987] 13 C.L.R. 22 (Q.B.)).  Valentino argues that under § 32 of the Limitation Act his claims may proceed if he can demonstrate a genuine issue of fact exists regarding whether he could have, with reasonable diligence, discovered the alleged fraud or concealment prior to November 13, 2000.  Based on the undisputed evidence, in particular Valentino's own statements, the court concludes that Valentino has not made the required showing.

The burden of proof is on the plaintiff to establish that he could not have discovered the fraud or concealment without taking "exceptional measures which [he] could not reasonably have been expected to take."  <u>Paragon Finance PLC v. D.B. Thakerar & Co.</u> [1999] 1 All E.R. 400.  In assessing the plaintiff's conduct, the court should consider whether a reasonable person "would act if he had adequate, but not unlimited staff and resources and were motivated by a reasonable but not excessive sense of urgency." <u>Id.</u> In his deposition Valentino explains that he was aware of the high level of risk associated with the investment program and that he nevertheless desired to proceed with the investment, with certain safeguards in place.  He also acknowledges in his affidavit that by November 1999 he was aware that the Bond defendants had transferred his funds from the escrow account to the Ruparelia Thaker law firm and that by December 1999 he knew the law firm had refused to refund his money to CAMC.  Valentino also acknowledges he knew by December 1999 that McDowell had made a claim with the Solicitors Indemnity Fund in the UK for return of the funds and that the matter had been referred to law enforcement authorities for investigation. Thus by at least the end of 1999 Valentino was well aware of the injury he had suffered through the disappearance of his investment

funds.  Valentino argues that the time a plaintiff becomes aware of his injury is not equivalent to the time he could have, with reasonable diligence, discovered the fraud that caused his injury.  The court agrees.  Nevertheless, as the Seventh Circuit has noted in citing UK law, the time an injury is discovered is the time "[a] reasonably diligent person [would] inquire as to the merits of his potential claim." See Northern Trust, 69 F.3d at 130 (citing R.B. Policies at Lloyd's v. Butler, [1950] 2 All E.R. 266 (K.B.) (emphasis added)). Valentino, however, did not inquire into the merits of his potential claim at the end of 1999, when he first learned of the serious problems with his investment funds.  Valentino briefly broached the subject of making a claim against the bond with McDowell, who convinced Valentino not to proceed.  Valentino has pointed to no evidence that shows he could not have discovered the alleged fraud perpetrated by CAMC without taking "exceptional measures which [he] could not reasonably have been expected to take."[16]   Paragon Finance PLC. 1 All E.R. 400.  To the contrary, the evidence suggests that Valentino had ample "red flags" regarding the disappearance of his money prior to November 13, 2000, and could have taken further action on his obvious concerns – which certainly rose to the level of a "reasonable but not excessive sense of urgency" – but chose not to.  At the end of 1999 Valentino certainly was aware that he was involved in a very high risk investment program involving a substantial amount of money that he had wired overseas to persons about whom he knew little and had little reason to trust; Valentino was also aware at that time that the deal was in serious trouble.  Moreover, Valentino knew  he had not received a copy of the executed security bond or the bank guarantee.  A reasonable person might well have doubted both the existence and validity of a bond he had never received and perhaps had never executed.[17]  No "exceptional measures" would have been required for Valentino to confirm in December 1999 that he had been victimized in a fraudulent

---

[16] Nor has Valentino pointed to evidence that creates a genuine issue of fact as to whether McDowell or others at CAMC served as the Bond defendants' agents.  At most, Valentino's allegations of this existence of an agency relationship between these persons amounts to speculation and surmise.

[17]  The record is unclear as to whether Valentino in fact ever executed any bond documents but it appears he did not.

investment scheme involving the transfer of his funds.  Rather, had Valentino taken the simple step of attempting to file a claim against the security bond he had been led to believe existed as soon as he learned his money was missing in late 1999, he could have – and would have – immediately discovered that no valid bond existed.   Thus with reasonable diligence Valentino could have discovered the alleged fraud or concealment, which purportedly also involved the Bond defendants, prior to November 13, 2000.[18]

Accordingly, even applying UK law, the court finds no genuine issues of material fact that would preclude granting defendants' motion for summary judgment on statute of limitations grounds.

**CONCLUSION**

The court finds that Florida law governs all six claims against the Bond defendants and that these claims are time-barred.  Alternatively, even if the law of the UK applied, there are no genuine issues of material fact precluding the entry of summary judgment in the Bond defendants' favor.   The motion to dismiss filed by the Bond defendants as to Counts I through VI of the complaint is therefore granted and these claims are

---

[18]  Valentino relies on Boatstaple Boat Co., Ltd., v. Jones [2007] EWCA Civ 727, LTL 17/7/2007, for the proposition that § 32 requires knowledge of an alleged fraud, not merely suspicion, to trigger the running of the limitations period.  Valentino also cites J.D. Wetherspoon plc v. Van de Berg and Co., Ltd [2007] EWHC 1044 (Ch), [2007] PNLR A28, for its holding that the limitations period does not begin to run until the plaintiff could, with reasonable diligence, have discovered the defendant's alleged concealment of deceitful conduct. The court in Boatstaple concluded that the plaintiff likely could succeed in showing he had exercised all reasonable diligence in pursuing certain documents that ultimately revealed he had been defrauded. Similarly, in Wetherspoon the court was persuaded that a jury question existed with respect to whether the plaintiff could have discovered the alleged breach of fiduciary duty in the exercise of reasonable diligence; correspondence from the fiduciary stating that nothing was "amiss" and that failed to report other relevant facts appeared calculated to put the plaintiff "off the scent" of his suspicions and in fact did so.

Both cases are factually inapposite to this one.  As discussed above, the evidence in this case reflects that Valentino did not act with similar diligence to inquire into any claim under the bond.  Nor, importantly, does the evidence show that any such efforts were thwarted by the Bond defendants.  While it may be that McDowell and others associated with CAMC so acted, as previously noted, Valentino has not come forward with evidence showing that McDowell or any other person or entity acted as the Bond defendants' agents. If anything, the evidence suggests that the reverse relationship existed between the Bond defendants and CAMC and, if it did, that it existed only through June 1999, when Bond closed the escrow account she had opened at CAMC's instruction.

Case No. 3:06cv504/MCR

DISMISSED, with prejudice.[19]

Accordingly, it is ORDERED:

1.      The motion for summary judgment filed by defendant Monica Bond and the Bond Partnership (doc. 67) is GRANTED.   Counts I through VI of the complaint are therefore DISMISSED, with prejudice.

2.      The court sua sponte dismisses defendant Albright, without prejudice, for plaintiff's failure to effect service.

3.      The clerk shall enter judgment in favor of defendant Monica Bond  and the Bond Partnership.

4.      If within ten days Valentino files a response showing good cause for the failure to timely effect service on Albright, the court may reconsider Albright's dismissal. If Valentino does not file a response or the court finds he has failed to show good cause, the clerk shall CLOSE this case.

**DONE and ORDERED** this 19th day of August, 2008.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[19]  The court recognizes the significant financial loss Valentino has sustained.  It is also aware that any hope Valentino may have had to pursue the recovery of his money likely will be extinguished with this ruling.  The court also recognizes, however, and must respect the important policy considerations underlying statutes of limitations that have led to this result, including prohibiting the prosecution of stale claims.  See e.g., Board of Regents of University of State of N.Y. v. Tomanio, 446 U.S. 478, 487-88, 100 S.Ct. 1790, 1796-97, 64 L.Ed.2d 440 (1980).

Case No. 3:06cv504/MCR